**Not for Publication in West's Federal Reporter**

# United States Court of Appeals

## For the First Circuit

No. 10-1036

CECELIA FRUSHER,
on behalf of Richard Frusher (deceased),

Plaintiff, Appellant,

v.

MICHAEL J. ASTRUE,
Commissioner of Social Security,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

[Hon. Mary M. Lisi, U.S. District Judge]

Before

Lipez, Howard and Thompson,
Circuit Judges.

Donna M. Nesselbush and Marasco and Nesselbush, LLP on brief for appellant.
Dulce Donovan, Assistant U.S. Attorney, Peter F. Neronha, United States Attorney and Robert J. Triba, Regional Chief Counsel, Social Security Administration, on brief for appellee.

September 2, 2010

**Per Curiam**.  Claimant Richard Frusher filed applications for Social Security disability benefits in 1975 and 1978, both of these applications were denied at the initial stage, and claimant missed the deadlines for appealing either denial.  Claimant then filed a successful application in November 2003, and he was found to have been disabled, on the basis of a psychotic disorder, as of April 1, 1975.  Claimant subsequently died, and his widow, Cecilia, was substituted as the party in interest.

Ms. Frusher then requested that the time limits for appealing the initial denials of the 1975 and 1978 applications be extended on the ground of good cause -- i.e., claimant's mental impairment had prevented him from being able to file, or to understand the need to file, timely requests for review.  See 20 C.F.R. § 404.909(b) and § 404.911(a)(4).  After a hearing, a different administrative law judge (ALJ) denied an extension of time, concluding that claimant had not made the requisite showing. Because this conclusion is marred by unsupported factual findings, we must vacate the district court's grant of judgment in favor of the Commissioner and remand for further proceedings.

## I.  The Disability Decision

We assume familiarity with the statutory and regulatory framework, as well as with the standard of review, and we therefore begin with a description of the first ALJ's decision finding that claimant was disabled.  The ALJ's conclusion in this regard

-2-

essentially was based on the testimony of an impartial medical expert, psychiatrist Dr. John Ruggiano. However, as the Commissioner has lost the hearing tape, we must rely on the ALJ's recounting of such testimony. We also note that the ALJ described Dr. Ruggiano's opinions as "consistent with and supported by the record as a whole," Trans. at 38, and, since they are the only specific evidence mentioned in the discussion of claimant's impairments, we assume that the ALJ, at least implicitly, was adopting these opinions as the factual underpinnings for his disability determination.

First, Dr. Ruggiano addressed claimant's functional limitations and testified that claimant had marked restrictions in his abilities (1) to engage in the activities of daily living, (2) to function socially, and (3) to maintain concentration and persist at tasks. Id. Dr. Ruggiano also described claimant as suffering from a psychotic disorder, accompanied by delusions or hallucinations, grossly disorganized behavior, and emotional isolation and withdrawal. Id. Given this, Dr. Ruggiano explained, claimant could be considered to be disabled under § 12.03 (Schizophrenic, Paranoid and Other Psychotic Disorders) of the Listings of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1.

Claimant appealed, and the Appeals Council first affirmed the ALJ's decision concerning claimant's disability and the April 1, 1975 date on which he had become disabled. Trans. at 41. The

-3-

Council then ordered a remand for a new hearing, id., and such hearing was held before a different ALJ.

## II. The Decision Denying an Extension of Time

The new ALJ, as noted, rejected claimant's arguments regarding the existence of good cause for an extension of time to appeal from either the September 4, 1975 denial of his first disability benefits application or the July 11, 1978 denial of the second such application. In support of this ruling, the second ALJ cited the following: (1) claimant never had been adjudicated mentally incompetent; (2) claimant, during September 1975 and July 1978, had been left alone at home, without a caretaker; (3) claimant, during this same time, had not been hospitalized and there was nothing in the record evidence indicating that there had been an exacerbation in his condition; (4) claimant had experienced no problems in filing the two prior applications; (5) claimant had worked, although not at the substantial gainful activity level, during the time that he claimed to have been disabled; (6) claimant had been allowed to be in charge of the mail and paying the bills; and (7) claimant had not transferred power of attorney to his wife until 1996, at which time he would have had to have been competent. Id. at 21, 23. The ALJ did not mention the first ALJ's adoption of Dr. Ruggiano's opinions regarding claimant's functional limitations.

The Appeals Council denied claimant's request for review, and the district court granted judgment in favor of the Commissioner. This appeal ensued.

### III. Discussion

For the following reasons, we find that the factors cited by the second ALJ do not provide substantial support for the conclusion that claimant had failed to show that his mental disorder had prevented him from timely appealing the denials of the prior applications. First, it appears from the initial decision awarding disability benefits that claimant had _not_ engaged in any kind of work activity during the relevant time periods -- 1975 and 1978. That is, and as the first ALJ specifically pointed out, although claimant's work record showed covered earnings in 1975 and 1976, such reflected accrued sick and vacation pay, "_not_ work activity after December 31, 1974." Trans. at 37 (emphasis added). And, as for 1978, the record shows that claimant had _no_ earnings during that year. Id. at 172.

Second, the ALJ's finding that claimant had been "in charge" of the mail is not entirely accurate. That is, claimant's widow testified at the second hearing that claimant's control over the mail essentially existed because she usually had been at work at the time that the mail had been delivered. Id. at 269, 271. And, while Ms. Frusher stated that she had permitted claimant to be in control of paying the bills, such had occurred in the early

1990s -- _not_ the 1970s -- and, as the ALJ himself acknowledged, she called this decision a "major mistake." _Id._ at 271-72. Similarly irrelevant is the fact that claimant had been sufficiently competent to transfer power of attorney to his wife in 1996; that is, claimant's state of mind in 1975 and 1978 is the issue.

Next, the ALJ's finding that claimant had experienced no difficulties in filing the two prior applications arguably is accurate only in relation to the 1978 application. As for the 1975 application, Ms. Frusher specifically testified that, although she could not remember exactly _how_ claimant had filed it, she "kn[e]w he didn't do it alone." _Id._ at 270. That is, she explained, she was unsure whether "it was me or the company [claimant's former employer] that helped him apply for it." _Id._ This testimony, we think, clearly indicates that _someone_ had assisted claimant in submitting the 1975 application. The ALJ nonetheless, and without explanation, viewed Ms. Frusher (1) as _admitting_ that she had not helped claimant and (2) as _speculating_ only that claimant's employer "may" have helped him. _Id._ at 21 n.4, 23 n.8. Since Ms. Frusher never so testified, and since there is no other evidence on the issue, the conclusion that claimant had experienced no difficulties in filing the 1975 application simply has no support in the record.

We also think that the fact that claimant had been left alone at home without someone watching over him says little about

his mental capacity for understanding and following instructions concerning how to appeal the denial of a social security application. Rather, it seems likely that this factor is more pertinent to such issues as whether claimant, without supervision, could take care of his physical and other such needs or whether, if left alone, he might, say, burn the house down. In any event, the Commissioner does not explain this factor's pertinence to the issue at hand.

This leaves, in addition to the inference that claimant had filed the 1978 application on his own, the other two factors cited by the second ALJ: (1) that claimant had not been adjudicated incompetent; and (2) that claimant had not been hospitalized in September 1975 or July 1978 and there was no indication in the record that his condition had been exacerbated during this time. The primary problem with the first factor is that there is no requirement that a claimant be declared incompetent, and the fact that claimant was not so declared simply cannot support an inference that he therefore <u>was</u> sufficiently competent to be able to follow the administrative appeals process.

As for the second factor, the Commissioner points out that, although claimant had been hospitalized in 1975, his discharge had occurred about six months prior to the September 4, 1975 denial notice. Similarly, the Commissioner notes that, while claimant had been hospitalized twice in 1978, his release had

occurred about one month before the July 11, 1978 denial. Moreover, the Commissioner continues, the records from these hospitalizations indicate that, when not in the hospital, claimant's symptoms had not been exacerbated.

The difficulty with the Commissioner's position is that he, as well as the second ALJ, ignore the impact of the first ALJ's factual findings -- i.e., that, as of April 1, 1975, claimant (1) had experienced marked limitations in performing the activities of daily living, in maintaining concentration, and in persisting at tasks, and (2) had exhibited grossly disorganized behavior. These findings are not limited to how claimant would function in a work setting, and, as explained below, they implicate his ability to do things for himself -- the touchstone, in this case, of the good cause analysis. See Social Security Ruling 91-5p, Mental Incapacity and Good Cause for Missing the Deadline to Request Review, 1991 WL 208067, at *2.

In this regard, activities of daily living include "adaptive activities such as cleaning, shopping, cooking, taking public transportation, paying bills, maintaining a residence, . . . using telephones and directories, and using a post office." 20 C.F.R. Part 404, Subpt. P, App. 1, § 12.00(C)(1). And, "marked" restrictions in these kinds of activities will be found where "the degree of limitation is such as to interfere seriously with [a claimant's] ability to function independently, appropriately,

-8-

effectively, and on a sustained basis." Id. § 12.00(C). Similarly, while someone with a "marked" limitation in the abilities to concentrate and persist at tasks might be able to complete simple tasks, he or she often cannot do so without supervision or assistance. Id. § 12.00(C)(3).

Given this, we think that the findings make by the first ALJ establish that claimant's mental condition seriously impaired his abilities (1) to independently take care of basic life activities, (2) to complete tasks without assistance or supervision, and (3) to act in any kind of organized fashion. Moreover, the first ALJ did not restrict claimant's functional limitations to any specific time -- e.g., when claimant was hospitalized or about to be hospitalized. Nor, since the tape of the first hearing has been lost, is there any evidence that Dr. Ruggiano so restricted his opinions. As a result, and resolving all reasonable doubt in claimant's favor as we must, see SSR 91-5p, we assume that the first ALJ implicitly had found that claimant generally had experienced such limitations, including when he was outside of the hospital.

In light of this, the fact that claimant had not been in the hospital in September 1975 or July 1978 cannot support the inference that his psychotic disorder thus did not prevent him from being able to process timely appeals at those times. Also inadequate to support such inference is the Commissioner's citation

to isolated statements in the 25-page treatment record of claimant's in-patient hospitalizations, which statements say nothing specific about claimant's state of mind during the relevant times. Last, and assuming that claimant had filed the 1978 application on his own, we do not think that this fact, standing alone, constitutes substantial evidence to support the conclusion that claimant possessed the ability to appeal from the denial of that application. Compare Matos v. Secretary of Health, Education and Welfare, 581 F.2d 282, 287 (1st Cir. 1978) (considering, where there was very little in the way of evidence showing a mental impairment in the first place, the fact that claimant had been able to file a prior application); Shrader v. Heckler, 754 F.2d 142, 144 (4th Cir. 1985) (noting, in finding that the claimant's mental impairment had not prevented him from pursuing his administrative remedies, the facts (1) that claimant had written to his lawyer stating that he would appeal every denial of his disability claims and (2) that claimant had, in fact, appealed one of the prior denials).

The sticking point is that, although the administrative record before this court contains only the reports from claimant's in-patient hospitalizations (and they are the only medical data listed in the record's table of contents, Trans. at 6), the first ALJ, in determining that claimant was disabled, stated that he also had reviewed the treatment notes from the various psychiatrists who

had seen claimant on an <u>out-patient</u> basis during the intervals between hospitalizations. <u>See</u> <u>id.</u> at 37. Given this, and given the flawed findings in the second ALJ's decision, we are of the view that such records, which might reveal information about claimant's functioning at the relevant times, should be reviewed. As such, we conclude that a remand is required.

The judgment of the district court therefore is <u>vacated</u>, and the case is <u>remanded</u> to that court with instructions to remand to the Commissioner for further proceedings in accordance with this opinion.